Good morning. Good morning, Your Honor. Thank you. May it please the Court, Patrick Philbin for Charter Communications. And I'd like to reserve three minutes of my time. Keep your eye out. I'll try to help you. Thank you, Your Honor. Your Honor, I'd like to cover three points this morning. First, the standard for causation under Section 1981 is but-for causation. Second, why the allegations in this complaint don't meet the standard, even for motivating factor causation. And third, I'd like to be sure to get to the First Amendment point because the First Amendment is a constitutional bar to this lawsuit. On your first point, we could spend a lot of time on this, but obviously under Miller v. Gammey, we can address Mattoy if it's necessary. I look at Groves. I look at Nassar. I think that's probably right. But the Supreme Court made it clear that if the language of the governing statute calls for a different standard, we don't even get to that other analysis. The standard that I see is whether people who are contracting are treated differently than, in quotes, white people. That may be said to be a motivating factor, but we won't call it that. You have to show, you know, I'm African American. I tried to deal with this company. They wouldn't deal with me, but my competitor over here, who does exactly what I do, is a white person, and he or she got the contract. I didn't, and it's because of race. Isn't that really what we're dealing with here in terms of causation? Well, Your Honor, the statute is phrased in terms of the same right as white citizens, but what the Supreme Court pointed out in both Groves and Nassar is also that but-for causation is the default rule. Unless the statute has other language. An indication to the contrary, but it's a default rule, and the way the court based that decision was on the time-honored, back through the 19th century, time-honored standards of Anglo-American tort law. And the Civil Rights Act, Section 1981 from 1866, is a federal tort statute, and it comes from the same tradition of Anglo-American tort law. It is a federal tort statute. So that background presumption that it is but-for causation is exactly what the Supreme Court was describing in Groves and Nassar, would apply to this statute as well. Unless its language gives a different statute. To the contrary, and I think, Your Honor, that just saying that the standard is were you treated differently from a white person, that indicates that if the black applicant for a contract did not get the contract, but there is a reason, the same reason that would have barred a white applicant, then that black applicant has received the same treatment as the white person. Correct. And so if there is some factor that would have barred both of them, they can't meet the standard for causation. That is but-for causation. That means that the black applicant has to show that race was determinative. So I think that is, even under that language of the statute, bearing in mind that there's a default rule. The Supreme Court has said that basic principles of common law tort apply. Do you lose if we don't apply a but-for concept? No, Your Honor, and let me turn to that. Because even if it were a motivating factor standard, the allegations in this complaint wouldn't meet that standard. And there are really two buckets of allegations. There are allegations asserting that the reasons Charter gave were false or pretextual and that they were treated differently from white-owned companies that were carried. And then a separate bucket of allegations about two supposed incidents of racist comments. Let me deal with them separately. On the first one, and this goes to the point, Judge Smith, that you were getting at and, Judge Schroeder, you were asking about, in terms of what did Judge Hatter want in the Comcast case. Because what he was applying there is a clear principle that you can't just come in and say someone else got the contract and I didn't and they were white. In order to raise a plausible inference that race was a part of that decision, you also have to allege facts showing that you were similarly situated. So, for example, with the limited bandwidth point. They say, well, you must not have had limited bandwidth because you expended bandwidth for white-owned networks that were launched. But what Judge Hatter was recognizing is there are costs associated. Bandwidth costs any time you launch a network. And you have to show, to show that you were treated differently, that you were an equally viable and equally useful expenditure of those limited resources. And that means specifically what you have to show are some factual allegations showing me that you're comparable in terms of demand for your networks to these white-owned. Well, do you have to show that in the complaint, though? Isn't Dean Chemerinsky correct that, you know, here we are at the pleading stage. They allege that, like with respect to the bandwidth and so on, that they were told they had to have a certain bandwidth. Later on they changed, but somebody— Your Honor, those are the allegations in the Comcast case. Okay. That's not in the charter case.  There aren't these allegations of changing— I don't have any of that here. Right. And just to be clear, Your Honor— Well, here you've got paragraph 37. Singer is saying, well, we're not launching. And during that same period they were, in fact, launching white-owned channels. These are just allegations. Now we're at the 12B6 stage. And also bandwidth and operational demands—this is paragraphs 37 through 40. Right. Bandwidth and operational demands have increased, and then they added certain channels like Longhorn Network, focusing on rural and western lifestyle issues in major urban cities like Los Angeles and Atlanta. So you've got allegations kind of along the same lines as the complaint in Comcast. And let me make two points on that, Your Honor. The first is I would direct the court to excerpts of record page 261. It's the e-mail team, because in this case we actually have the e-mail communications in the record. And what Mr. Singer said in that e-mail is, we're not launching general entertainment e-basic. It's not in our business plan. And he said, other than sports channels that we have to carry. Right? So it's e-basic launches for general entertainment other than sports. That is the rationale that was given. That matches up exactly with what Charter actually did. There are no allegations that are contrary to that. They point to five networks, they say, that allegedly were launched. Three of them are sports networks. The Longhorn Network, which is sports for the University of Texas, and it's a Disney channel. It's part of the package you have to take if you want Disney. And two are sports channels here in Los Angeles. It's the English and the Spanish versions of local sports channels for the Lakers, the Dodgers, the Galaxy, things like that. So that fits with the rationale in that e-mail from Mr. Singer. The only other two networks that they point to are not general entertainment e-basic launches. They point to the RFD TV and Chiller, which are very narrow, genre-specific. One is Western Lifestyle. One is a horror channel. And they do not allege in the complaint that those were e-basic launches because they can't. You can look up charters channel lineups, and those aren't on e-basic. Those are carried on a premium tier. That's a significant economic difference whether you're doing it on part of the basic tier or a premium tier. It changes the economic return for what you're getting in launching that. So they don't have any allegation that goes contrary to that clear explanation that was given in that e-mail that's in the record here. And the other point, Your Honor, is that, and this is sort of the critical legal principle, that even at the pleading stage, to get to your question, Judge Smith, even at the pleading stage, you have to allege something, something factual to suggest that you are similarly situated, you are comparable to someone else who got the contract or got the job. In a Title VII case, for example. Do you have to name the other company? Otherwise, instead of saying there were seven white-owned companies that got the benefit I wanted, they got it because they were white, do you have to say it was companies A, B, C, D, E, and F, and so on? Well, Your Honor, I don't know that I could say it's a blanket rule you have to name them, but you have to allege, you know, this company, some other applicant got the job and was comparable to me in that they had this parameter that was relevant and I had a better parameter. You have to have something that is actually comparing you to the person that got the contract. Can I change our focus for just a moment here? You've got rather doltish comments by Messrs. Singer and treatment by Mr. Rutledge. There is language in some of our cases about things that are not, of the negotiating process. What is your client's perspective on the alleged comments by these two people, comments or treatment by these two people? Well, let me say first, Your Honor, Charter categorically denies that those events occurred. We say those are fabrications, those aren't. But accepting them for purposes of this procedural posture, Your Honor, that is correct. Under Ninth Circuit precedent, even comments that are racially based and that are made by a decision maker, if they are unrelated to the decisional process, they are treated as stray remarks. And critically, the district court in this case recognized that and said, and this is in excerpts of record page 11, that taken alone, these comments, even these allegations would not be sufficient, even under a motivating factor standard, even under that lower standard, to make a plausible inference of discrimination in this case. And that's correct under cases such as Nesbitt v. PepsiCo and Merrick v. Farmers Insurance because these comments were months after the decision had been made, eight months and ten months. They were totally unrelated to the decision. Now, let me just ask you this. When we listened to Dean Chemerinsky in the other case, he indicated, and I realize they're different, but we're dealing with the same statute. His comment in part was, look, you know, you've got this whole tent of activities, all these things that are occurring here, and you just have to look at the whole thing, take that into context to see whether or not there's racial discrimination. Even if you treat the one comment and the one action as not being part of the negotiation, if it reflects or arguably reflects the attitude of some senior executives of the company, is that something we simply don't take into account in terms of racial animus? How do we treat it, if at all? Well, Your Honor, I think the answer is this, and I think this was a legal error that the district court made here because the district court pointed out, all right, there are these one bucket of allegations that supposedly direct evidence of racial bias, these racist comments. The district court recognized, but you know what? They're unrelated to the decision, so on their own, they don't get you over the threshold to plausibly inferring racial bias. Well, let me ask you this. If I understand correctly, Mr. Rutledge is a CEO or something like that, and the owner of the plaintiff in this case wanted to meet with him and thought he could and was basically brushed off and called a racist name, boy. Well, Your Honor, let me just be clear. The allegation is that before the decision had been made, before July 2015, they were told you can't have a meeting with Mr. Rutledge, he doesn't do these meetings. They tried to circumvent Mr. Singer. These are allegations in the complaint and contact Mr. Rutledge directly, and he did not have a meeting with him. That's before the decision was made. The decision then is final in July 2015. But wasn't it part of the negotiation process, though? That much was. But then the allegation about this comment, that's what I'm just trying to emphasize, was ten months after the decision had been made, not in any way related to the negotiation process. The allegation is they bumped into each other at an industry event. So it's not related to the decisional process of negotiation. Under your understanding of Nesbitt and other cases that Mr. Singer's comments, Mr. Rutledge's action, unless basically you're sitting in a room negotiating the contract, it doesn't make any difference? Is that your perspective? Well, Your Honor, it doesn't have to be that now, but the Ninth Circuit has set down the rule that if it's unrelated to the decisional process. Well, I guess what I'm troubling with, say Rutledge, the owner of the plaintiff wanted to meet with him as part of the negotiation process. He was turned away and was told, basically, or observed and alleges that they don't meet with African Americans, basically. Not at all, Your Honor. He was told they don't. Mr. Rutledge doesn't meet with programmers. That's what he was told. But then he did meet with programmers, at least according to the allegation. He met with the allegations, the CEO of Viacom. And again, we come to the critical legal principle. You've got to show that you are similarly situated. Viacom has one of the biggest libraries of media in the industry. A meeting with the CEO of Viacom is not comparable to a meeting with the CEO of Viacom. It sounds to me, and I can't disagree with you, that the crux of this and the other case is how closely do you have to show that you're similarly situated? Is that the key to a 1981 successful action now? Well, Your Honor, if the way you're trying to raise a plausible inference of discrimination, there are different ways you can try to do it. If the way you're trying to do it is to say there were white people who were treated differently, then Judge Hatter was absolutely correct that the legal rule is you've got to allege how you're similarly situated to them. But it isn't white, black. It's you're white and black, but you are similarly situated. Absolutely, Your Honor. Because otherwise it's a business thing. Then what do you do with our case? What is it? I've forgotten. Not Santa Cruz, but the other one. Starr v. Fox. Sorry, exactly. What do you do with that? Your Honor, post-stating that decision, this Court made clear in Century Aluminum and in Eclectic Properties that the standard where you have two different explanations that are mutually exclusive, it's the plaintiff's burden to allege facts suggesting that the benign alternative explanation is ruled out. And that's language that comes directly from ICBAL. Eclectic Properties picks up that language from ICBAL. And that's the standard that Judge Hatter applied and he correctly applied. I agree with you, counsel, that it isn't enough to say, you know, this isn't a white person versus a black person. This is a company versus a company, right, or various companies that were offered contracts versus a company that wasn't offered it. So you have to show that you're kind of in the same position and have the same market power, for example. There are some allegations. Now I'm going to maybe mix up the two complaints a bit, but there are allegations along the lines of, you know, you said that you weren't interested, you wanted me to basically gather this sort of evidence, but then you told me that that evidence isn't good enough. During that same time period, you dealt with some white companies that are lesser known, some of which then, you know, went out of business. They have smaller market shares. So allegations along those lines would demonstrate that you're either similarly situated or, in fact, better situated as a partner than some of these other companies, right, with evidence setting aside whether those allegations are, in fact, present in the complaint that is at issue in this case. Allegations along those lines would demonstrate similarly situated criteria, wouldn't it? Well, let me address that in two parts, Your Honor. The first is to allegations that you told me I was supposed to do X and then X didn't matter. That allegation is not in the charter case. That's only in the Comcast case. And if you had a case where there were several allegations that you said to do X and then you told me X didn't matter and you said to do Y, that could maybe start to move you on the road to an inference that someone's getting the runaround. Maybe. But it's not in the charter case. The second one that you're pointing to that, well, you launched lesser known white networks, in order to allege that you are similarly situated, there has to be an allegation of fact. There has to be something that actually backs up. You can't just – it would be a conclusory recitation of parts of the elements of the cause of action to say, Well, I have this racial background. So you've got to name the companies. You've got to – this company has only 30 percent of market share. I've got 50. Those sort of allegations? A conclusory assertion that, well, you gave the contract to someone else and I say I'm better than that person. You have to back that up with facts. That's the whole point of it. You can't just make a conclusory recitation of the elements of your cause of action. And that's the rule Judge Hatter applied correctly. That's why he was demanding, and he gave them in the Comcast case the chance. He said, You've got to say something that shows me how it is that your demand is comparable to them. That's the only way that you're going to show me you were treated unfairly. And if that same correct standard had been applied to the complaint in this case, the charter case, this complaint would have been dismissed. You've gone over time. We're going to give you a little time because we've taken you over. But since it's Judge Wu we're talking about here who felt differently, why don't you sit and we'll have you come back up briefly and let's hear from the other side briefly and then we'll go on. Thank you, Your Honor. I did want to get to the First Amendment. Understand that's why it's first, right? We'll give you a very brief time to comment. The district court denied the motion to dismiss in this case and certified the First Amendment question to the court. Let me start where you did with regard to Mottorio v. Chastman. It specifically says that mixed motive claims are allowed under Section 1981. Neither of the Supreme Court cases pointed to by the other lawyer in any way undermine Mottorio. Both of those involve statutes that use the language because of. And the Supreme Court emphasized that because of implies a but-for cause requirement. And I can give you exact pages where the Supreme Court stressed that it's because of language that's crucial with regard to this. The Supreme Court says in Gross at 557 U.S. at 176 and in Nassar at 570 at 352 that it's that. In fact, Nassar explicitly says that status discrimination claims, like race discrimination claims, are treated differently than retaliation claims. And Nassar says if Title VII were written in broad language, it would be a very different situation. And you find that at 570 U.S. at 356. You heard what I commented on before. Are you agreeing then with my point that we really, Nassar and Gross really don't, they're not determinative here because we have a statute with specific language that we can interpret that doesn't use the word because, doesn't necessarily flow from that language as a but-for or motivational factor? That's exactly right, Your Honor. You have a Ninth Circuit precedent, Mottorio v. Chastman. There are two Supreme Court cases dealing with different statutes, statutes that use the words because of. The Supreme Court interpreted those words because of as creating a causation requirement. Even though there's some dicta about a general presumption with regard to statutes, it's not a basis for this panel to be able to rule the decision of another panel of this court. Now, this appeal is not primarily about whether the complaint has sufficient facts to withstand a motion to dismiss, but I think your opposing counsel doesn't adequately focus on what the district court said because the district court addressed many of the things. And I want to point this Court to excerpt of record, page 9, the district court decision. This is page 8 of Judge Wu's opinion. He says, even if the court would agree with the defendant in that regard, that similarly situated statutes were not treated differently, and the district court then says, but the evidence is not nearly as much clearly in the defendant's favor as the defendant asserts, and points to paragraphs in the complaint, 21, 22, 32, 41, 45, 55, and 87, that would suggest that charter communication was treating white-owned stations differently than black-owned. The district court then says, Comparison with a similarly situated entity is only one way that plaintiffs could demonstrate discrimination. Direct evidence of racial animus suffices as well. In plaintiffs' favor, Singer's and Rutledge's statements could qualify allowing the existence of a similarly situated entity as not the only one of the pleading requirements. And I would also direct this Court to page, excerpt of record, page 11, which opposing counsel refers to, but not accurately. Here the district court said, If Singer's and Rutledge's alleged arguably racist statements were all that plaintiff could muster, the court would likely agree with the defendant they were insufficient to satisfy a motivating factor standard of the pleading stage. But when they are viewed in combination with the several-year effort made by ESN and viewed most favorably to plaintiffs, continued stonewalling and provision of excuses that do not match up with defendants' practices with non-African-owned media companies, the court believes that plaintiffs have validly stated a claim under 1981. And so what you have here is a complaint that alleges that this 100 percent African-American-owned set of channels is treated differently than white channels, combined with direct evidence of race discrimination. That's sufficient to withstand a motion to dismiss. So under Judge Wu's ruling, the only thing he really certified under 1292B was the First Amendment issue. From his perspective, there was a plausible complaint stated with respect to 1981. Is that correct? Exactly, Your Honor. Okay. So from your perspective, you like Judge Wu's ruling, right? I encourage you to very carefully read, as I know you will, Judge Wu's thorough opinion. I read it. Judge Wu very carefully went through the evidence and said, at this stage it's sufficient to withstand a motion to dismiss, that under Mottorio v. Chastman all that's required is to show a motivating factor, and that even if it were a but-for test, I believe the complaint alleges that but for the race of the plaintiffs, there would have been, these contracting would have gone on. We have this terrible dilemma, though, that Judge Wu graduated from the University of Chicago Law School, Judge Hatter graduated from the University of Chicago Law School, and so did I. I don't know what to do. Well, so do I, and I don't have any trouble. She didn't. Let me address the First Amendment issue that's presented. What here the defendants are arguing is that media companies have a blanket exemption from the First Amendment with regard to the choice of channels. If you accept their argument, even if Mr. Singer and Mr. Relig said, we will never contract with an African-American-owned company, there would be no basis for liability under 1981. That's a historic and unprecedented claim. And I think Judge Wu characterized it exactly right. Here I'm quoting excerpt of records, page 16, page 15 of Judge Wu's opinion. What defendant seeks here is a First Amendment-based exemption from racial discrimination laws for an entire industry. This is not a question about the content that a media company can choose. This is a question of whether or not a media company has the right on the basis of the First Amendment to discriminate on the basis of race. It's interesting that here the defendants want to invoke the Supreme Court's decision in Hurley. But Hurley was very careful to distinguish Turner Broadcasting and the cable situation. Hurley was also very careful in saying that there those who were running the parade were making a choice on the basis of content. Ultimately, you really come back to the same issue here. Was the discrimination on the basis of race? Or was it a business choice made by the defendants? If it's the former, then it violates Section 1981, and the First Amendment can be no defense. On the other hand, if it is on the basis of legitimate business reasons, then the defendants would win.  Do you agree that in this situation 1981 is a statute? It's a neutral statute. There's no compelled speech. So basically we'd be analyzing it under intermediate scrutiny. Is that a fair statement? Well, I think that's right, Your Honor. But Cone v. Kyle's communication specifically says there is no exemption from law's general applicability on the basis of the First Amendment. If the plaintiffs can prove, as they allege, that this is about race discrimination, then there is a claim under 1981, and then there is no First Amendment defense. You don't even need to get to the issue of levels of scrutiny. If you wanted to put this in the framework of levels of scrutiny, stopping race discrimination should not only be regarded as an important interest under intermediate scrutiny, but a compelling interest that would meet strict scrutiny. That's only a governmental interest, a strong interest, right? I don't like hypotheticals, but I will offer one. If a newspaper, which runs all kinds of op-ed columns and has to deal with those people on a contractual basis, if it said, we're only going to deal with white columnists because we have freedom of the press and we're going to run the columns of white people, is that violate 1981? I think it would, and here you can go back to the Pittsburgh Press case where what was involved there was newspapers that wanted to run sex-based want ads, men only, women only, and the Supreme Court said that that's not permissible. The First Amendment doesn't provide a blanket excuse to discriminate. If the newspaper said, we like conservative and not liberal columnists, it's about the content of the columns, that's within the realm of the newspaper to decide. But if they're going to say, we're never going to contract with an African American to write a column for us, that would violate 1981, and the First Amendment can't provide a defense. It would be, as I said, historic and unprecedented to say that the First Amendment provides a blanket defense for media companies to discriminate in any way that they want. What's your best case to that point that says that the First Amendment cannot provide a defense to a 1981 action? I know of no case on point. I don't either, that's why I'm asking. Your Honor, there is no case that has ever said that the First Amendment is a defense to race discrimination. Or a license for. Pardon? And I think it is precisely because this has not been asserted before that you don't have it, and I don't think it would be because it would be so unprecedented to say that just because it's a media company, it has a right to engage in race discrimination. If you asked for the best cases to support my position in other areas, I'd go back to what I said to Judge Schroeder, Cohn v. Cowell's communication, or I'd go back to the cases that say the media has no exemption from labor law and employment law, no exemption from antitrust law. Why say that the media gets an exemption from race discrimination when it doesn't from all of these other laws? I'd even analogize to other areas where the Supreme Court has said when it's a neutral law of general applicability, the First Amendment doesn't provide exceptions. Employment Diversion v. Smith does that in the Free Exercise Clause area. But it does, I assume, permit a company, media company, to choose to engage in race discrimination. Yes, of course, any media company can choose the views that it wants to air, but that's not what this case is about. This case is about can a media company say we're not going to contract with an African American owned channel. And it's at that point that Section 1981 comes into play, and the First Amendment is not a defense. You're saying that this isn't really about the content of the program? Well, that's the underlying factual issue. The claim that Plaintiff's making is that this is about race discrimination, v. 1981. The defendants can argue that this is about the choice in terms of the content of the program, and that should be decided at summary judgment or trial. Plaintiffs certainly say that by any objective measure, the content of their program is adequate here to be covered. These are channels that have won or been nominated for Emmys. All of the other major cable companies carry 500 channels, everything but these particular channels. That, I think, is enough to get past the motion to dismiss, and then it can be decided, is this about content or is this about race discrimination? And if there's not other questions, I'll say thank you so much. Thank you very much. So for the good graces of Dean Chemerinsky, we're going to give you his three minutes to make your First Amendment argument, because I know he wants to hear it as well. Thank you, Your Honor. And I'd like to start by saying that Charter categorically denies that race played any role in its decision here. Race-based decision-making is abhorrent. It has nothing to do with the way Charter does its business. But the abstract legal question here, we're required to take the allegations as true. And the question is, what does the First Amendment say about a cable company that allegedly used race in deciding what their ownership was? Before you get that, the dean made an important point I'd like your response to. He makes the point that media companies are not exempt from, for example, labor laws or antitrust laws. Do you agree with that? I do, Your Honor, and this case is very different in this case because this case is about the pure marketplace for speech. It is only and very narrowly about the decisions made in buying and selling prepackaged speech. It goes to Judge Schroeder's example of the newspaper that's deciding which op-ed columnist it's going to run columns with. That is a pure decision about speech. Well, let's just say that that's ultimately what comes to be. But you're at the pleading stage right now, and if the pleading on the other side says, you're refusing to treat with me because I'm African-American, how can that be, if you will, defended by the First Amendment just on its face? I'm not talking about if you get underneath and you find out that there really are market issues and so on, that may be a different issue, but on its face. There are two reasons, Your Honor. The concept of content and content-based in the First Amendment context is broad enough that it covers the identity of the speaker and the characteristics of the speaker, and let me make two points on this. The first is, on the face of the complaint, if you look at Paragraph 64, the plaintiffs say that the point of this lawsuit, the point of all of these lawsuits against other people in this industry, is to advance the, quote, voices of African-American-owned media companies. In Paragraph 36 of the complaint in the Comcast case, they refer to the diverse viewpoints of African-American-owned media companies. Their theory on the face of the complaint is that ownership does determine a distinct content and viewpoint. They're inseparable. That is what is on the face of the complaint. In addition, even putting that aside, so this is a content-based attempt to use Section 1981 to dictate what speech someone else would decide to use. Even putting that to one side, say that you had a journal that wanted to advance African-American authors, and they said, we don't care about what you write about. We don't care if it's poems, short stories, literary criticism, scientific articles. We want to promote African-American authors. We're going to decide what speech we want to promote based on the identity of the speaker. That's permissible. The government could not come and pass a statute saying you're not allowed to do that. That statute wouldn't be treated as content neutral. That's dictating to a speaker what content and the criteria about content that speaker wants to further promote and disseminate. So this attempt to try to distinguish, oh, well, if it's racial discrimination, it's one issue. If it's content, it's different. Let me ask my colleague, do either of you have any questions about the First Amendment issue? We'll give you one more minute, and then we're done, okay? Thank you, Your Honor, I appreciate that. I think it's critical to understand in the First Amendment context, Hurley sets the principles that apply here. Because that was also a case about selecting units of speech. And what the court said there is it doesn't matter what the parade organizer's rationale is. They didn't have to have a particularly content-based, articulable rationale. The exact words from Hurley is whatever the reason, they decided not to want to promote someone else's speech. That lies beyond the power of the government to control. That's the principle that governs this case. And I think that's shown by the hypothetical of the journal that wants to promote African-American authors. Or you could go the other direction and say the KKK journal. They get to decide what authors they want to promote based on the identity of the speaker. Thank you, counsel. So thanks to all counsel in, frankly, both cases. Very helpful. These are important cases. We recognize that, and we will make a decision as soon as we can. The case just argued is submitted. And thank you all.
judges: Schroeder, M. Smith, Nguyen